UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RENA WEISMAN,

                            Plaintiff,                    03 Civ. 9299 (PKC)

     -against-

                                                                MEMORANDUM
                                                                   AND ORDER

THE NEW YORK CITY DEPARTMENT OF
EDUCATION; DISTRICT 20 OF THE NEW
YORK CITY DEPARTMENT OF EDUCATION,
and VINCENT GRIPPO, in his Official Capacity
as Former Superintendent of District 20 of the
New York City Department of Education,
MARGARET DE GAETA, in her Official
Capacity as Principal of Public School 176K, and
ELIZABETH CULKIN, in her Official Capacity
as Assistant Principal of Public School 176K,

                            Defendants.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiff Rena Weisman brings this action under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., alleging that the defendants discriminated against her on the basis of age. She also asserts that her rights were violated under, the New York State Human Rights Law, Executive Law § 296, the New York City Human Rights Law, Administrative Code of the City of New York, §§8-101 et seq., and the Civil Rights Act of 1964.[1]

        This action was filed on November 21, 2003. I accepted assignment of this action as related to another case, Carmellino v. New York City Department of Education, 03 Civ. 5942. Discovery is now closed, and the defendants have moved for

---

[1] The Complaint includes one allusion to the Civil Rights Act of 1964, and does not set forth any recognizable claims under the Act. (Complaint ¶ 1)

summary judgment seeking the dismissal of all claims asserted by Ms. Wander. For the reasons explained below, the defendants' motion is granted.

Background

Ms. Weisman is employed by defendant New York City Department of Education as a teacher of English as a Second Language ("ESL"). (Def. 56.1 ¶ 1) She was employed at P.S. 176K in Brooklyn until 2003, when her request to transfer to another school was granted. (Def. 56.1 ¶¶ 2, 39-40) In 1999, defendant Margaret De Gaeta became principal of P.S. 176K, and defendant Elizabeth Culkin became assistant principal. (Def. 56.1 ¶¶ 3-4) During the time period relevant to this action, P.S. 176K was part of District 20 in Brooklyn, where defendant Vincent Grippo served as district superintendent. (Def. 56.1 ¶¶ 5-6)

The plaintiff's claims of discrimination are premised on three incidents. The first arose in the fall of 2002, when Ms. De Gaeta verbally warned Ms. Weisman for being late. (Def. 56.1 ¶ 12; De Gaeta Dec. ¶ 9) According to Ms. De Gaeta, Ms. Weisman was "repeatedly late" after this warning, which prompted Ms. De Gaeta to warn her that if she failed to move her time card three consecutive times, she would have to punch in via a time clock. (De Gaeta Dec. ¶ 10; Memo, Oct. 21, 2002, attached at Def. 56.1 Ex. A) When Ms. Weisman continued to be late to work, Ms. De Gaeta asserts, she required her to punch a time clock, starting on October 24, 2002, and kept her on the time clock for approximately two months. (De Gaeta Dec. ¶¶ 12-13; Memo, Oct. 23, 2002, attached at Def. 56.1 Ex. B) Ms. De Gaeta asserts that during the 2002-2003 school year, six other teachers received written or verbal communications about lateness. (De Gaeta Dec. ¶ 11)

The second allegedly adverse employment action arises from a decision not to give Ms. Weisman her own classroom and to make her teach in a school hallway. According to Ms. Weisman, from September 2001 through June 2002, she taught ESL in other teachers' classrooms. (Weisman Dec. ¶ 7) As a so-called "push in" teacher, Ms. Weisman entered other teachers' classrooms to teach ESL. (Weisman Dec. ¶ 7) Ms. De Gaeta asserts in her declaration that for the 2002-2003 school year, P.S. 176K was overcrowded and there were not enough classrooms for all teachers. (De Gaeta Dec. ¶ 4) She states that she decided two categories of teachers would not be assigned full-time classrooms: funded reading teachers and ESL teachers. (De Gaeta Dec. ¶ 5) Students of the four ESL teachers at P.S. 176K were temporarily removed from their standard classrooms, and taught by ESL instructors in the school hallways. (De Gaeta Dec. ¶ 7) Ms. De Gaeta states that Ms. Weisman was assigned to teach in a second-floor hallway because she had complained of a heart condition and needed a medical accommodation to protect her from having to ascend multiple flights of stairs. (De Gaeta Dec. ¶ 8)

Ms. Weisman states that she was required to teach in a hallway space near two bathrooms, an auditorium, and a public phone, which caused "a vast amount of noise and disruption" to the learning environment. (Weisman Dec. ¶¶ 9, 25) Ms. Weisman states that the hallway was windowless and that there "was no air," making it "extremely hot" in the summer and cool in the winter. (Weisman Dec. ¶ 9) She contends that the hallway atmosphere made her physically ill on occasion. (Weisman Dec. ¶ 9) Ms. Weisman states that two younger ESL teachers were assigned to use a classroom that she herself once used. (Weisman Dec. ¶¶ 10, 27) Additionally, Ms. Weisman states, there were two vacant classrooms in the school building, which Ms. De Gaeta would not

3

permit her to utilize. (Weisman Dec. ¶ 28) According to Ms. Weisman, Ms. Culkin and Ms. De Gaeta began informally observing her two to three times per day in February and March, 2003. (Weisman Dec. ¶ 31) She depicts their "increased surveillance" as retaliatory, and based upon a prior complaint that Culkin discriminated against her by denying her a locker. (Weisman Dec. ¶¶ 29-30, 32)

The third alleged adverse employment action involves an investigation arising from Ms. Weisman's knowledge that one of her students may have been abused in the home. On September 5, 2002, P.S. 176K conducted a training session for its teachers about child abuse and neglect detection. (Def. 56.1 ¶ 17) The Department of Education had adopted and promulgated a rule that governs teachers' obligations to report possible child abuse and neglect, codified at Chancellor's Regulation A-750. (De Gaeta Dec. ¶ 15) Ms. Weisman attended that training session, where copies of Regulation A-750 were distributed. (Def. 56.1 ¶¶ 18-20) Regulation A-750 reads in part:

> [A]ll pedagogical and non-pedagogical school personnel are mandated reporters. As a mandated reporter, when a child comes before you in an official or professional school related capacity and you have reasonable cause to suspect that the child was been abused, maltreated or neglected ("child abuse"), <u>you are required to notify the principal or designee immediately</u>. You are not required to possess reasonable certainty before a report is made, only reasonable suspicion.

(Regulation A-750 ¶ 1.1.1(a), attached at De Gaeta Reply Dec. Ex. L) (emphasis added)

According to Ms. De Gaeta, on June 29, 2003, she was informed for the first time that nearly a week earlier, a five-year-old student of Ms. Weisman had indicated to Ms. Weisman that her mother hit her, and that she liked to stay with her grandmother. (De Gaeta Dec. ¶¶ 18, 22) It is undisputed that Ms. Weisman did not notify the principal, Ms. De Gaeta, or her designee, Marisol Ferrer, who was a school

4

guidance counselor, about the student's utterances. (Def. 56.1 ¶ 22) Ms. De Gaeta asserts that she learned of the student's circumstance from Assistant Principal Culkin, after the child's regular classroom teacher, Ms. Ruscitti, learned of the child's situation from Ms. Weisman. (De Gaeta Dec. ¶ 20) Ms. Culkin states that the student's classroom teacher informed her of possible abuse, and "promptly notified" Ms. De Gaeta of the situation. (Culkin Dec. ¶¶ 4-6)

Ms. De Gaeta later reported the possible abuse to child welfare authorities and to the police department for further investigation. (Def. 56.1 ¶ 28) On January 29, 2003, Ms. De Gaeta commenced an investigation of whether Ms. Weisman violated an obligation to inform immediately the designated school officials about the child's statements. (Def. 56.1 ¶ 29) Ms. Weisman was sent to the District Office on January 29, and remained there for two weeks. (Def. 56.1 ¶¶ 30-31) She asserts that Ms. De Gaeta informed her that she had been sent to the District Office on Mr. Grippo's orders. (Weisman Dec. ¶ 18) Ms. Weisman describes her two-week period at the District Office as embarrassing, humiliating, and "a blemish" on her "impeccable reputation." (Weisman Dec. ¶¶ 43-44) She received no loss of salary or benefits while in the District Office, and resumed her regular responsibilities at P.S. 176K. (Def. 56.1 ¶¶ 31-32)

On February 14, 2003, Ms. De Gaeta met with Ms. Weisman and her union chapter leader to discuss Ms. Weisman's failure to report the suspected case of child abuse to the necessary designated persons; subsequently, a letter dated March 4, 2003 was placed in her personnel file, recounting her failure to comply with the regulation. (Def. 56.1 ¶¶ 33-34) The letter set forth the chronology surrounding the student's statements and the investigation that followed. (Letter, March 4, 2003, attached

5

at Def. 56.1 Ex. G) According to Ms. Weisman, Ms. De Gaeta did not subject a younger, similarly situated teacher who also was aware of this student's circumstance to such allegations and investigations. (Weisman Dec. ¶ 15) Ms. Weisman filed a grievance over the letter. (Def. 56.1 ¶ 35)

At the close of the 2002-2003 school year, Ms. De Gaeta gave Ms. Weisman a performance rating of satisfactory, as she had on all previous performance evaluations that she completed for Ms. Weisman. (Def. 56.1 ¶¶ 37-38) Ms. Weisman requested and received a transfer to a new school, I.S. 220, starting in the 2003-2004 school year. (Def. 56.1 ¶¶ 39-40) Although there is no issue of constructive discharge in this case, Ms. Weisman states in her affidavit that she "had no choice but to leave P.S. 176K," and that when she transferred to a new school, she sacrificed seniority privileges she gained at P.S. 176K during 33 years of teaching. (Weisman Dec. ¶ 45) Ms. De Gaeta states that upon Ms. Weisman's transfer, P.S. 176K did not hire a new ESL teacher to replace her. (De Gaeta Dec. ¶ 35)

Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The

6

evidence on each material element must be sufficient to entitle the movant to relief in his or her favor as a matter of law. Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed. R. Civ. P. In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial." Powell v. Nat'l Bd. of Medical Examiners, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslandis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and citations omitted); accord Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. See Fed. R. Civ. P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate.

Discussion

    1. Plaintiff's burden in establishing prima facie case

Defendants' motion is premised upon the assertion that the three incidents central to this action – Ms. Weisman's assignment to teach in the school hallway, the requirement that she punch a timeclock upon entering work, and the investigation and circumstances surrounding her knowledge that a child may have been abused – cannot constitute adverse employment actions under federal law, thus warranting dismissal of this action.

Where there is no direct evidence of discrimination, the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), determines whether a plaintiff's claims survive summary judgment. McDonnell Douglas's burden-shifting test applies not only to Title VII claims, but also to claims brought under the ADEA, see Jetter v. Knothe Corp., 324 F.3d 73, 75 (2d Cir. 2003) (per curiam), and to claims brought pursuant to the New York State Human Rights Law and the City Human Rights Law, see Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466, cert. denied, 534 U.S. 993 (2001). First, the plaintiff must establish a prima facie case of age discrimination. Jetter, 324 F.3d at 75. If a prima facie case is established, then the burden shifts to the employer to set forth a legitimate, nondiscriminatory reason for the employment action. Id. Lastly, if the defendant has established a legitimate, nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that this stated rationale is a mere pretext for discrimination. Id. at 75-76.

To establish a prima facie case of age discrimination, a plaintiff must show that he or she is a member of a protected class, was qualified for the position held,

suffered an adverse employment action, and that surrounding circumstances give rise to an inference of discrimination. Abdu-Brisson, 239 F.3d at 466. "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997) (per curiam). It is not "intended to be rigid, mechanized, or ritualistic." Abdu-Brisson, 239 F.3d at 467 (internal quotation marks omitted).

The defendants' motion assumes arguendo that Ms. Weisman's claims satisfy two prongs of the prima facie case required by McDonnell Douglas: that she falls within the protected class of persons age 40 or older, and that she is qualified for her position. Defendants base their motion on a contention that Ms. Weisman experienced no adverse employment action, and that no surrounding circumstances give rise to an inference of discrimination.

The Second Circuit describes an adverse employment action as "a 'materially adverse change' in the terms and conditions of employment." Sanders v. New York City Human Resources Administration, 361 F.3d 749, 755 (2d Cir. 2004) (citing Richardson v. New York State Dep't of Correctional Services, 180 F.3d 426, 446 (2d Cir. 1999)). Materially adverse changes "include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "The prohibition against discrimination is not limited to 'pecuniary emoluments,' but includes discriminatorily-motivated diminution of duties." Preda v. Nissho Iwai

9

American Corp., 128 F.3d 789, 791 (2d Cir 1997) (per curiam); see also Feingold v. New York, 366 F.3d 138, 152-53 (2d Cir. 2004) (excessive workload and subsequent termination constitute adverse employment actions). However, the Second Circuit has observed that its criteria for evaluating claims of an adverse action are narrower than that applied by other Circuits. Sanders, 361 F.3d at 756. "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Wanamaker v. Columbia Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). The Second Circuit has identified a triable issue of fact when, for instance, a plaintiff asserted that his job duties and responsibilities were diminished in retaliation for complaints of bias; yet the same panel concluded that the employer's requirement that plaintiff sign a confidentiality agreement was not materially adverse. Preda, 128 F.3d at 791-92.

I now consider whether the plaintiff has established a prima facie case as to the three incidents central to her action.

### A. Ms. Weisman's alleged lateness

The first incident I consider is Ms. Weisman's alleged chronic lateness, and the actions undertaken by Ms. De Gaeta to address it. According to Ms. Weisman, she was singled out by Ms. De Gaeta for her lateness, and was harshly scrutinized for tardiness while younger teachers were similarly late without repercussion. (Weisman Dec. ¶¶ 11-13) Ms. Weisman does not assert that she was incorrectly accused of being late, only that she was singled out from younger, similarly late teachers.

Another court in this Circuit recently considered at the summary judgment stage whether the plaintiff in a Title VII action suffered an adverse employment action

when her employer erroneously marked the plaintiff as tardy and thereafter required her to fill out a timesheet accounting for her whereabouts at the workplace. Presley v. Pepperidge Farm, Inc., 356 F. Supp. 2d 109, 132 (D. Conn. 2005). The district court concluded that the plaintiff had not shown any adverse effects arising out of these incidents when she failed to illustrate "how or why the effect would be serious, whether either incident was noted in her file, or even whether they were put in writing." Id. Presley concluded that, without more, the conditions placed on the plaintiff did not constitute an adverse employment action. Id. Accord Scott v. Bell Atlantic Mobile, 2002 WL 550969, at * 5 (S.D.N.Y. Apr. 11, 2002) ("defendant's general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny of plaintiff are not sufficiently adverse to make out a prima facie of retaliation because plaintiff has failed to come forward with evidence to show how these actions severely hampered her growth at Bell Atlantic.")

Ms. Weisman relies upon comments from Ms. De Gaeta indicating that Ms. Weisman's lateness may prompt an unsatisfactory rating, or "U rating." (Weisman Dec. ¶ 13) This, in turn, made Weisman "feel frightened, sleepless, nervous, and uncomfortable at work . . . ." (Weisman Dec. ¶ 13) However, Ms. Weisman's anxiety and disquietude is not evidence that the employer's conduct constitutes an adverse employment action. At best, it is evidence of the consequences of conduct alleged to be an adverse action. As to the threatened "U rating," courts of this District have routinely held that an unsatisfactory rating itself may not constitute an adverse employment action. See Evans v. City of New York, 2003 WL 22339468, at *11 (S.D.N.Y. Oct. 14, 2003) ("'[N]egative evaluations alone, without any accompanying adverse consequence are not

adverse employment actions.'") (quoting Pellei v. Int'l Planned Parenthood Federation/Western Hemisphere Region, Inc., 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999)); Castro v. New York City Bd. of Educ., 1998 WL 108004, at *7 (S.D.N.Y. March 12, 1998) ("[T]hat [defendant] may have given plaintiff unsatisfactory ratings, reprimanded her on one occasion, or closely monitored her classroom performance does not support an inference that the conditions of plaintiff's employment were materially changed."). The Second Circuit recently observed in dictum that neither a threatened nor received unsatisfactory rating may constitute an adverse employment action, absent accompanying diminution in salary or benefits. Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005) (citation omitted). Ms. Weisman has not directed the Court to any evidence that her salary or benefits were diminished as a result of the threatened "U rating." Based on the foregoing, I cannot conclude that Ms. Weisman suffered an adverse employment action in the incidents arising out of accusations of her tardiness.

B. Ms. Weisman's assignment to teach in the school hallway

Next, plaintiff argues that she was adversely affected by the reassignment to teach in the second floor hallway of P.S. 176K. Defendants argue that Ms. Weisman's assignment to teach in the hallway was a mere inconvenience, and cite to Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002), which observed that "not everything that makes an employee unhappy is an actionable adverse action." Ms. Weisman contends that two ESL teachers under the age of forty were allowed to teach in a classroom, while two ESL teachers over the age of forty were forced to teach in hallways.

The plaintiff does not dispute that during in the 2002-2003 school year, P.S. 176K was confronted with overcrowding problems. (De Gaeta Dec. ¶ 4) ESL

12

teachers were not the only ones required to teach in less than ideal circumstances. For instance, funded reading teachers taught in what is described as a "blended" model: the funded reading teachers taught their students in the back of a regular classroom, while the rest of the students received classroom instruction from a teacher in the front of the room. (De Gaeta Dec. ¶ 6) This "push in" method of instruction was complemented by "pull-out" instruction, where students were removed from the classroom and instructed in a different setting. (De Gaeta Dec. ¶ 6) In the 2002-2003 school year, Ms. Weisman and all other ESL teachers taught their students using the "pull-out" model. (Weisman Dec. ¶ 9; De Gaeta Dec. ¶ 7)

In the 2001-2002 school year, Ms. Weisman was a "push-in" teacher who "would enter another teacher's classroom to teach ESL to the students." (Weisman Dec. ¶ 7) Presumably, ESL teachers were designated to teach in these settings because they instruct students who are otherwise integrated in a grade-level classroom and meet with the ESL teachers for a discrete educational purpose. Ms. Weisman's own deposition testimony reflects that the ESL teachers also were struggling with limited resources. When asked whether Ms. Hom, one of the ESL teachers under 40, also taught in the hallway, Ms. Weisman replied: "No. Actually, she taught in the back. She taught wherever she could – wherever she could hide." (Weisman Dep. at 95) Ms. Weisman also stated that they had been told at a meeting that all ESL teachers were to teach in the hallways, though she added that younger teachers were not bound by this rule. (Weisman Dep. at 95) The second ESL teacher under age 40, Ms. Fitzgerald, did not regularly teach classes because she had been assigned to work as a testing coordinator for the 2002-2003 year. (Weisman Dep. at 96) To the extent that Ms. Fitzgerald instructed students,

13

plaintiff asserts that she taught both in the hallway and in Room 518, primarily in the latter. (Weisman Dep. at 96)[2]

The Second Circuit requires a district court to "pore over each case to determine whether the challenged employment action reaches the level of adverse." Wanamaker, 108 F.3d at 466. I have done so, and conclude that the facts do not support plaintiff's assertions that she suffered a materially adverse action. Unlike grade-level teachers, ESL instructors did not receive permanent classrooms; it is unclear from the record whether this is due to limited resources or the need to maintain instructional flexibility. In her deposition, Ms. Weisman noted that she previously taught students in a para-lunchroom, a PTA room, and in Room 508B. (Weisman Dep. at 94) These settings may have been preferable to the environment of the second floor hallway, but they clearly were temporary, makeshift settings. Ms. Weisman's assignment to the hallway did not accompany other diminution in benefits, title, or responsibilities. This contrasts with other cases, where an employee's reassignment to difficult work conditions, combined with a tangible loss of benefits, constituted a materially adverse change. See Demoret v. Zegarelli, 361 F. Supp.2d 193, 203 (S.D.N.Y. 2005) (assignment to work in a "storage space with no windows, heat, air conditioning, or ventilation," accompanied

---

[2] Ms. De Gaeta's reply declaration forms no basis for my determination on whether Ms. Weisman has set forth a prima facie case because it was submitted by the defendants in their reply. Ms. De Gaeta asserts that in September 2002, each of the school's four ESL teachers were informed that they would be assigned to teach in a hallway, and were given access to Room 518 to store books and materials. (De Gaeta Reply Dec. ¶ 4) According to Ms. De Gaeta, Ms. Hom and Ms. Fitzgerald taught in hallways and occasionally in Room 518. (De Gaeta Reply Dec. ¶ 7) Ms. De Gaeta states that Room 518 was made available for instruction at these two teachers' requests, contingent on permission from the other two ESL teachers, Ms. Cafara and Ms. Weisman. (De Gaeta Reply Dec. ¶ 7) Any ESL teacher was permitted to use Room 518 for instructional purposes, Ms. De Gaeta asserts, provided that they received permission from the other ESL teachers. (De Gaeta Reply Dec. ¶ 7) As support for Ms. De Gaeta's assertions, the defendants submit a P.S. 176K organizational chart from the 2002-2003 school year. (attached at De Gaeta Reply Dec. Ex. K) The chart indicates the teachers' subjects and room numbers. The four ESL teachers all are listed under Room 518, and are not assigned individual rooms.

with diminution of responsibilities and fewer work hours, constituted an adverse employment action). In Wanamaker, the Second Circuit observed that Collins v. State of Illinois, 830 F.2d 692 (7th Cir. 1987), an opinion cited by both sides in this case, concluded that denial of an office and a telephone merely contributed to the finding of an adverse action when accompanied "by a loss of status, a clouding of job responsibilities, and a diminution in authority." 108 F.3d at 466.

Ms. Weisman's assignment to the second floor hallway is unaccompanied by any such tangible, material adversity. Viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, I conclude that she has not raised any triable issues of fact supporting her claim that her assignment to the hallway constituted an adverse employment action. As such, the defendants' summary judgment motion is granted as to this claim.

C. Ms. Weisman's knowledge of possible child abuse

The third allegation that defendants argue cannot constitute an adverse action arises from the letter placed in Ms. Weisman's personnel file following the investigation into her failure to report a student's statement regarding at-home abuse. According to the defendants, Ms. Weisman was not treated differently than similarly situated employees of all ages, and suffered no adverse consequences arising out of the investigation.

Ms. Weisman asserts, however, that the investigation was discriminatory in nature because other Ms. De Gaeta "did not subject younger similarly situated teachers" to investigation. (Weisman Dec. ¶ 15) As an example, she argues that the child's regular classroom teacher, Gina Ruscitti, knew that the child had attendance

15

problems, but was not investigated by the defendants. (Weisman Dec. ¶ 15) Ms. Weisman also relies upon an assertion that the child actually had not been subjected to child abuse. (Weisman Dec. ¶ 17) While the investigation was underway, Ms. Weisman states, she was assigned to the District Office on Mr. Grippo's orders, where she was subjected to embarrassment and witnessed favoritism toward younger teachers. (Weisman Dec. ¶¶ 18-20, 43-44)

Although the incidents and events surrounding the school district's investigation of Ms. Weisman caused her distress, they do not rise to the level of an adverse employment action. Ms. Weisman experienced no decrease in pay, benefits or responsibility. No diminution in her working conditions arose from the investigation. The sole tangible effect was the placement of a letter in her personnel file. The letter recites in detail the history of the student's statements to Ms. Weisman and the ensuing investigation. It concludes by stating that "[t]he above misconduct may lead to further disciplinary action including an unsatisfactory rating for this school year and the preferral of 3020A charges which could lead to your termination." (Def. 56.1 Ex G)

As previously discussed, Ms. Weisman received a rating of satisfactory at year's end, and was granted a request to transfer schools at the end of the school year. Additionally, a letter of reprimand generally is not, in itself, an adverse employment action. Brierly v. Deer Park Union Free School District, 359 F. Supp. 2d 275, 300 (E.D.N.Y. 2005) (collecting cases); Honey v. County of Rockland, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002) ("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on

probation."). Aside from personal frustration, Ms. Weisman does not set forth any facts showing that she experienced negative effects arising out of the investigation and letter of reprimand. The record before me does not raise any triable issues of fact that support plaintiff's contention that the investigation and letter constitute an adverse employment action. As such, I grant defendants' motion for summary judgment on this issue.

D. Additional incidents at P.S. 176K

The plaintiff argues that, in addition to the three previously discussed incidents or conditions, she was subjected to materially adverse treatment as it pertains to mentoring younger teachers and not being permitted to attend career development seminars. (Weisman Dec. ¶¶ 23-24; Pl. Mem. at 11-12) Plaintiff fails to set forth any evidence as to whether her "mentoring" status was a formal or informal position, and does not assert that an inability to mentor resulted in a diminution in salary or benefits, or affected her title, status, or work responsibility, or had any other effect on her employment. In addition, she does not cite to any specific career development seminars that she was not permitted to attend, and does not set forth any evidence as to how lack of attendance at such seminars affected any workplace condition or career development.

Because plaintiff has not shown any negative workplace impact from being denied mentor status and not being invited to attend unspecified workshops, I conclude that she has failed to set forth a prima facie case as to any claims implicating these matters.

2. Retaliation

Generously construed, I do not read the Complaint as asserting that the defendants engaged in unlawful retaliation toward her. The Complaint alludes to

"increased scrutiny" by the defendants, but it is unclear from the Complaint whether this scrutiny had a retaliatory nexus. (Complaint ¶ 65) To the extent that Ms. Weisman is pursuing recovery on a theory of retaliation, the defendants move for summary judgment dismissing such a claim. To have a viable claim for retaliation, a plaintiff must show that he or she engaged in activity protected by statute, that the employer was aware of the activity, and that the employer made an adverse employment decision because of that activity. Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 285 (2d Cir. 1998). Even if an employee is not the victim of prohibited discrimination, that employee is protected from retaliation for protesting any such discrimination. Id.

The record does not raise any triable issue of fact that supports a retaliation claim. Ms. Weisman states that in September 2002, she questioned Ms. De Gaeta about $18,000 allocated for ESL supplies, and that shortly thereafter she was ordered to teach ESL in the second-floor hallway. (Weisman Dec. ¶¶ 8-9) This discussion about budgetary matters has no discernable relation to any discrimination. Ms. Weisman also implies that Ms. Culkin may have stolen her plan book and lesson book, and that she subsequently "complained to De Gaeta about Culkin's harassment, discriminatory treatment towards me, and my belief that age was the basis of this treatment." (Weisman Dec. ¶¶ 21-22) Additionally, Ms. Weisman indicates that she complained that younger teachers participated in training sessions that excluded older teachers. (Weisman Dec. ¶¶ 23-24) She also contends that she was denied use of a locker because she complained about Ms. Culkin, and that her complaints heightened surveillance of her teaching. (Weisman Dec. ¶¶ 30-32)

To the extent that Ms. Weisman contends that she was forced to teach in the second-floor hallway as retaliation, the record is unclear as to the temporal connection between her complaints and the timing of her assignment to teach in the hallway. The record does not show how a complaint about the ESL budget might constitute protected activity under the antidiscrimination laws. The remaining averments submitted by Ms. Weisman are unclear as to what adverse actions may have arisen out of her complaints about age discrimination. As the party opposing the summary judgment motion, it was her burden, in response to defendants' motion, to come forward with evidence demonstrating a triable issue of fact. She has not done so. Moreover, accepting as true her assertion that she was subjected to increased monitoring, such supervision does not, without more, constitute an adverse employment action. See, e.g., Ifill v. United Parcel Service, 2005 WL 736151, at *3 (S.D.N.Y. Mar. 29, 2005) ("Monitoring of employee time and travel has also been held insufficient to constitute an adverse employment action."); Morrison v. Potter, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005) ("'Although . . . close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.'") (quoting Castro v. New York City Board of Education, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998)). Similarly, the plaintiff has not come forth with any facts that show a materially adverse impact from Ms. De Gaeta's refusal to assign the plaintiff a personal locker.

To the extent that the plaintiff asserts a retaliation claim, I grant the defendants' motion for summary judgment, and that claim is dismissed.

Conclusion

The defendants' summary judgment motion is GRANTED and the case is dismissed. The Clerk is directed to enter judgment in favor of the defendants.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
July 29, 2005